**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA BLAND, on behalf of A.M., a minor, | ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 14 C 4327 |
| v. | ) ) | Judge Jorge L. Alonso |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Maria Bland, on behalf of her minor daughter, A.M., brings this action seeking reversal or remand of the Acting Commissioner of the Social Security Administration's ("Commissioner") final agency decision denying Bland's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3). The parties have filed cross-motions for summary judgment. After reviewing the record, the Court denies plaintiff's motion and grants defendant's motion for the following reasons.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on February 22, 2011, alleging that her then 11-year-old daughter A.M. had been disabled since January 29, 2011, following a diagnosis of attention deficit hyperactivity disorder ("ADHD"). (R. 124-132.) The Social Security Administration ("SSA") initially denied the application on June 9, 2011, and again on reconsideration on September 13, 2011. (R. 78-81; 82-85.) Plaintiff filed a timely request for hearing, and on November 19, 2012, she and A.M. appeared before Administrative Law Judge Judith S. Goodie

(the "ALJ").  (R. 42.)  The ALJ heard testimony from plaintiff and A.M., who were represented by counsel.  (R. 44-71.)

On December 21, 2012, the ALJ issued a written decision concluding that A.M. was not disabled within the meaning of the Social Security Act (the "Act").  (R. 19-41.)  The Social Security Appeals Council denied plaintiff's request for review on May 8, 2014.  (R. 1-6.)  On June 11, 2014, plaintiff filed the present action for judicial review.

## BACKGROUND

A.M. was born on September 17, 1999 and was thirteen years old at the time of the hearing and the ALJ's decision.  At that time, A.M. was in the sixth grade at the Chicago International Charter School ("CICS") and lived with her mother and three younger brothers in a house on the west side of Chicago.[1]

### A.    Medical History

#### 1.    Medical Records from Treaters

A.M.'s medical records contain records from two primary-care providers.  The earlier records, which date from some time in 2007 through 2011, are from the Salud Family Health Center and Austin Family Health Center ("AFHC") locations of the PCC Community Wellness Center.  (R. 244-270.)  Included in those records is an undated "Pediatric Psychiatric Evaluation" that was evidently created in 2007, when A.M. was repeating the second grade.  (R. 255.)  The

---

[1]A.M.'s grandmother was likely living in the household also (although the Court so notes simply for completeness and not because it is a factor in the Court's analysis).  Although the February 2011 SSI application did not list A.M.'s grandmother as a household member, A.M. testified at the November 2012 hearing that her grandmother sometimes took her to or picked her up from school and on some mornings tried to wake her up for school.  (R. 46, 50.)  On May 19, 2011, Dr. White noted in his evaluation, which is discussed below, that in addition to A.M., her family consisted of her mother, grandmother, and three siblings.  (R. 277.)

evaluation states that A.M. was referred from her primary-care provider for behavioral health services because of attention problems, and that her teacher and mother had completed "Vanderbilt screens," which indicated possible ADD or ADHD. The notes also state that while A.M. was "doing well grade-wise," she had an IEP (Individual Education Plan), and A.M.'s mother was concerned about her speech and academic performance.

The January 13, 2009 note of Shelley Bagri, APN (Advanced Practice Nurse), indicates that A.M. was taking an 18-milligram daily dose of Concerta (a medication prescribed for ADHD), which A.M. thought was helping her at school, and that A.M.'s mother felt that she was "now doing well in school." (R. 254.) A.M. continued to take Concerta in 2009. According to Bagri's note of July 30, 2009, plaintiff did not think Concerta was helping A.M. that much because she was not hyper, just "extremely inattentive." (R. 254.) Bagri's December 8, 2009 note indicates a diagnosis of ADHD and states that A.M. was still taking Concerta. (R. 253.) As of February 8, 2010, A.M. was seeing "significant improvements" with medication. Her medication was changed to a 10-milligram dose of Focalin XR, a "longer-acting" ADHD medication, to be taken each morning.[2] (R. 252.)

On June 22, 2010, A.M. visited AFHC for a camp physical with Dr. Brooke Turnock. The records from the physical indicate in relevant part that A.M. was seeing Bagri for ADHD, which was "stable" and treated with Focalin XR, and that "3rd grade went well, no summer school." (R. 245-46, 250.) According to Bagri's September 30, 2010 note, A.M. continued to

---

[2]According to the form that plaintiff evidently completed in October 2012 in which she listed the medications plaintiff was taking at the time, Focalin was first prescribed for A.M. in May 2007. (R. 211.)

take the same dose of Focalin, school was "going well," and there were "no concerns from teachers." (R. 252.)

A.M. visited Bagri on March 3, 2011, because of plaintiff's concern that the Focalin may have been causing headaches and vomiting. Bagri stated in her notes that they planned to stop the medication "to assess need" and see whether the side effects went away. (R. 251, 263-64.)

The second set of A.M.'s medical records are from Circle Family Care and date from April 2011 through October 2012. (R. 286-87; 302-04; 306-13.) Those records contain an ADHD "treatment plan" for A.M., which identified her problems and goals and created a plan of action. (R. 302-04.) The notes from A.M.'s April 15, 2011 visit for a routine physical state that she "has ADHD off Focalin 10 mg XR" due to persistent abdominal pain and was "not paying attention, disorganized, missing questions." (R. 313.) Dr. Penny White diagnosed probable GERD (gastroesophageal reflux disease) and prescribed Zantac, and also restarted A.M. on Focalin XR, 10 milligrams to be taken each morning. (R. 313.) On June 23, 2011, Dr. White noted that "parent requests psychiatric evaluation re behaviors" and that a referral was made for that purpose. (R. 287.) The records do not indicate any follow-up on that referral. On September 1, 2011, A.M. visited the office for a school physical; the notes indicate that her abdominal pain had improved and she had stopped taking Zantac. She continued to take the same dose of Focalin XR. (R. 310.) A.M.'s office visits in 2012 were unrelated to her ADHD, but the notes from the February 3, 2012 visit indicate that A.M. continued to take Focalin.

## 2. Evaluations

On May 19, 2011, psychologist Don White, Ph.D., ("Dr. White") conducted a Psychological Evaluation of eleven-year-old A.M. for the Illinois Bureau of Disability Determination Services ("DDS"). (R. 277-279.) Dr. White met with A.M. and plaintiff. He

4

reviewed "[s]tatements from Community Welfare Agency, including Internal Medicine" and statements made by plaintiff, but no reports from A.M.'s school. (R. 277.) Dr. White noted that A.M. was in the fourth grade and in "regular classes"; had "no behavior problems in school"; had friends and could relate interpersonally; had been treated for ADHD for the past two years, "primarily" with medication; and was taking Focalin, 10 milligrams. (R. 277.) He further noted that A.M.'s motor activity was "somewhat elevated." (R. 277.) On examination, A.M. demonstrated relevant, comprehensible, coherent, "somewhat pressured" speech and good eye contact, and she was "cooperative and friendly." (R. 277, 279.) Dr. White found that A.M. appeared to have "adequate Adaptive Behavioral Fu[n]ctioning"; was "currently receiving treatment for ADHD with appropriate medication"; had an adequate fund of information and no memory impairment; and had adequate judgment and ability to do calculations (although she was unable to do one of six calculations he asked her to perform) and analyze and synthesize data. (R. 278, 279.) He diagnosed ADHD. (R. 278-79.)

A few weeks later, on June 8, 2011, psychologist Larry Kravitz, Psy.D., completed a Childhood Disability Education Form regarding A.M. for DDS. (R. 295-300.) He did not examine A.M.; he reviewed the medical and school records and Dr. White's report and concluded that although A.M. had a severe impairment, it did not meet, medically equal, or functionally equal any impairment listed in the SSA regulations. (R. 295.) He also evaluated A.M. on the six domains of functioning designated by the SSA.[3] Dr. Kravitz found that the only domain in which A.M. had any limitation was "attending and completing tasks" and that she had a "marked" limitation in that domain. (R. 297-98.)

_____

[3]These domains are addressed in greater detail below.

On September 9, 2011, psychologist David Voss, Ph.D., also completed a Childhood Disability Evaluation Form regarding A.M. and evaluated her on the six domains of functioning. (R. 289-294.)  Like Dr. Kravitz, Dr. Voss examined the records but did not examine A.M. herself.  He concluded that A.M. had a severe impairment, but it did not meet, medically equal, or functionally equal any impairment listed in the Social Security regulations.  (R. 289.)  Dr. Voss found that the only domain in which A.M. had any limitation was "attending and completing tasks" and that she had a "less than marked" limitation in that domain.  (R. 291-292.)

**B.**     **Educational History**

The record includes an Individual Education Plan ("IEP") for A.M., dated November 1, 2011, when A.M. was in the fifth grade.  (R. 180-210.)[4]  The IEP stated that A.M. was receiving 560 minutes per week of direct special-education services in her regular classroom (for reading and math) and 280 minutes per week of direct services in a separate special-education classroom (for language arts and writing).  (R. 183, 203.)  It also stated that A.M. spent twelve percent of her classroom time in the separate special-education classroom.  (R. 203.)   The IEP stated that A.M. has ADHD and took Focalin every morning to help with concentration, and it described in detail her strengths, performance, developmental, functional, and communication needs, and assessment/test results.  According to the IEP, A.M. was performing at the average level in math (at grade level for computation but well below grade level for math concepts and applications), had certain struggles with language arts but did well with reading comprehension, and her writing was below average.

---

[4]A.M.'s IEPs from previous school years are not included in the record, but an April 2011 "IEP Report Card" is included, which indicated that A.M. had been making expected progress.  (R. 273-75.)

Also included in the record is a "Teacher Questionnaire" issued by the Social Security Administration, which was completed by A.M.'s special-education teacher, Katie Flood, on October 11, 2012, when A.M. was in the sixth grade. (R. 212-219.) Ms. Flood stated in the questionnaire that she had known A.M. for four years and spent two hours with her each day for reading and language arts. (R. 212.) She also stated that A.M. had a current reading level of a fifth grader and a written-language level of a fourth grader. (R. 212.) In the questionnaire, Ms. Flood evaluated A.M. in various aspects of the six domains of functioning. (R. 213-218.) Ms. Flood indicated that A.M. had several problems with certain aspects of the first two domains, "acquiring and using information" and "attending and completing tasks," one problem with "interacting and relating with others," and no problems with "moving about and manipulating objects" or "caring for herself." (R. 213-217.) As to the "acquiring and using information" domain, Ms. Flood stated that A.M. had a "serious" problem in two areas—providing organized oral explanations and adequate descriptions and expressing ideas in written form, had "obvious" or "slight" problems in seven other areas, and no problem with understanding and participating in class discussions. (R. 213.) As to the "attending and completing tasks" domain, Ms. Flood stated that A.M. had a "serious" problem in two areas—carrying out multi-step instructions and completing work accurately without careless mistakes, had "obvious" or "slight" problems in eight other areas, and no problem with sustaining attention during play, waiting to take turns, or completing class and homework assignments. (R. 214.) Ms. Flood also stated that A.M. was "doing extremely well" that year in school and "comes ready to learn" and "focused," "is much more focused and performs much better when she takes her medication," and "is participating and is organized (with support)." (R. 218.)

## C. A.M.'s Testimony

A.M. testified at the November 2012 hearing that she was thirteen years old and in the sixth grade at CICS's West Belden campus. (R. 45-46.) A.M. stated that she had repeated second grade (R. 52), and that although she was usually in a regular classroom, she was removed from that classroom for part of the school day to a separate classroom for special education services in reading and language arts. (R. 46.)

A.M. testified that her mother, brothers, or grandmother woke her up in the morning for school. Sometimes she went back to sleep and needed someone to wake her up again. (R. 50.) She took Focalin once a day, before leaving for school in the morning. (R. 49.) A.M. believed that the Focalin helped her focus in class (R. 49-51). She did not get help taking the medicine; she took it herself. (R. 49.) A.M. noticed when the Focalin wore off, during her last subject, near the end of the school day. (R. 51-52, 54-55.) Sometimes she noticed that when it wore off, she fidgeted more or talked with a classmate instead of doing her schoolwork. (R. 54-55.)

A.M. stated that she had chores at home that she was expected to perform—clearing the table after meals, washing the dishes, cleaning her room, and sweeping the floor. (R. 50-51.) Her mother usually needed to remind A.M. to do her chores, but when she was reminded, she did them. (R. 51.)

A.M. testified that she liked to "hang out" with her friends at school, drawing on the board and playing on the computer. (R. 47-48.) In her free time outside of school, she liked to play tag or run in the backyard with her brothers (at the time, eight-year-old twins and an eleven-year-old) and go to the library with a friend. (R. 48-49.)

**D.    Plaintiff's Testimony**

Plaintiff testified at the November 2012 hearing that A.M. first began having problems in school when she was in first or second grade.  (R. 64.)  A.M.'s teacher had reported that several times, A.M. walked out of class without raising her hand to ask for permission.  (R. 58-59.)  The teacher further reported to plaintiff that A.M. was having problems reading, so plaintiff arranged for after-school tutoring.  (R. 64.)  The tutor said that A.M. fidgeted and had problems with attention.  (R. 64-65.)  Plaintiff "first started hearing about ADHD" from the tutor.  (R. 65.)  A.M. had to repeat the second grade, and plaintiff took her to a doctor, who prescribed ADHD medication.  (R. 65.)

Plaintiff testified that A.M. took a 10-milligram dose of Focalin XR each day when she was in school.  (R. 59.)  A.M.'s pediatrician, Dr. Penny White, prescribed this medication.  (R. 65.)  Plaintiff acknowledged that the dose of Focalin did not last through the entire school day and wore off by the time A.M. had returned home and did her homework.  (R. 59.)  She also acknowledged that A.M. had been taking the same dose of Focalin for at least four or five years and that plaintiff was considering making an appointment with A.M.'s doctor to discuss increasing the dosage.  (R. 59-60.)  A.M. had not had therapy for ADHD and was treated solely with medication.  (R. 60.)

Plaintiff testified that someone has to wake A.M. up for school every day.  (R. 58.)  Plaintiff had to check A.M.'s school uniform because A.M. sometimes forgot to put on elements of the uniform, such as her belt.  (R. 61.)  Plaintiff testified that sometimes when A.M. is asked a question, one may have to repeat the question several times because at first, A.M. does not quite understand the question or fully answer.  (R. 56-57.)  (As the ALJ acknowledged, that circumstance was indeed evident during A.M.'s testimony.)  Plaintiff explained that, for

9

instance, A.M. did not appear to fully understand a question about whether she sees her friend outside of school. A.M. answered that she goes to the library with that friend, but plaintiff picked A.M. up from school and took her straight home. Plaintiff explained that A.M. did spend time in the *school* library with her friend, however. (R. 56-57.)

A.M. does not like to read, and plaintiff had to constantly remind A.M. to do her daily assigned reading. (R. 57-58.) Plaintiff also had to help A.M. with her homework and science project. (R. 58, 62-64.) A.M. had problems organizing her homework and book bag and understanding what her homework assignments were. (R. 66-67.)

At the time of the hearing, the reports plaintiff received from school about A.M.'s behavior were sometimes good, sometimes "not so good." (R. 62.) At home, although A.M. was sometimes "mean" to her brothers, which plaintiff believed was "probably just sibling issues," A.M.'s behavior was "okay." (R. 62.) Plaintiff had to constantly remind A.M. to do her chores, and A.M. did not always complete them well. (R. 61.)

## DISCUSSION

### A.     Standard of Review

If the Social Security Appeals Council denies a request for review, "the ALJ's decision becomes the final decision of the [Commissioner]." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). A reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The reviewing court's role is "extremely limited." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). "We reverse the Commissioner's final decision only if it is not supported by substantial evidence or is based on a legal error." *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003)

(noting that "[t]his is a deferential but not entirely uncritical standard"). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, even if the court might have decided the case differently in the first instance, it must affirm the decision if it has adequate support. *Id.*; *Simila*, 573 F.3d at 513. In rendering a decision, the ALJ "must build a logical bridge from the evidence to h[er] conclusion, but [s]he need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). "Our review is limited to the reasons articulated by the ALJ in her decision." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) ("When reviewing for substantial evidence, we do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.").

**B.      Standards for SSI Benefits for Children**

A child is disabled within the meaning of the Act and thus eligible for SSI if she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To determine whether a child meets this definition, an ALJ engages in a three-step analysis, in the following order. 20 C.F.R. § 416.924(a). First, the ALJ considers whether the child is engaged in "substantial gainful activity." *Id.* If so, the claim is denied. If not, the ALJ moves to the second step, which is to consider the child's mental and physical impairments to determine whether the child has "an impairment or combination of impairments that is severe." *Id.* If the child does not suffer from such an impairment, the claim is denied. If the child does, the ALJ moves to the third step,

which is to review the claim further to determine whether the impairment "meets, medically equals, or functionally equals the listings" of impairments that qualify for SSI and can be found at 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id; see also Giles v. Astrue*, 483 F.3d 483, 486-87 (7th Cir. 2007).

A child's impairment *meets* a listed condition only when it satisfies all of the criteria of that listing. 20 C.F.R. § 416.925(c)(3), (d). A child's impairment *medically equals* a listed condition when it is "at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 416.926(a). Medical equivalence will be found when (1) the child's impairment, though listed, is lacking one or more of the medical or severity criteria, but other findings related to the impairment are of at least equal medical significance to the listed criteria, *id.* § 416.926(b)(1); (2) the child's impairment is not listed but the impairment's medical and severity findings are of at least equal medical significance to a closely analogous listed impairment, *id.* § 416.926(b)(2); or (3) the child has a combination of impairments, no one of which equals a listed impairment, but the impairments' medical and severity findings are of at least equal medical significance to a listed impairment, *id.* § 416.926(b)(3).

To *functionally equal* a listing, the impairment must be of "listing-level severity," meaning that it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id.* § 416.926a(a). The domains of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Id.* § 416.926a(b)(1). The first five domains describe what a child

should be able to do throughout five age categories; the category at issue here is "adolescent" (age 12 to age 18). *See id.* § 416.926a(g)(2)(v), (h)(2)(v), (i)(2)(v), (j)(2)(v), (k)(2)(v).[5]

A "marked" limitation is one that is "more than moderate" but "less than extreme" and is found when the child's impairment "interferes seriously with [her] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). An "extreme" limitation is "more than marked" and is found when the child's impairment "interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i). Social Security Ruling 09–1P instructs an ALJ to evaluate the "whole child" when making a finding regarding functional equivalence.

## C. The ALJ's Decision

The ALJ found that A.M. was a school-age child on the date the application for SSI benefits was filed and an adolescent at the time of hearing and decision. (R. 25.) The ALJ further found that A.M. had not engaged in substantial gainful activity since the application date and that A.M. suffers from ADHD, a severe impairment that does not meet or medically equal the listings. (R. 25.) After discussing the medical and school evidence and the testimony of A.M. and plaintiff in detail, the ALJ further determined that A.M.'s ADHD does not functionally equal the listings because it does not result in at least two marked limitations or one extreme limitation in the six domains of functioning. (R. 25-37.) Specifically, the ALJ found that A.M. has (1) a less than marked limitation in acquiring and using information; (2) a less than marked

---

[5]Unlike the other five domains, the domain of health and physical well-being does not categorize children by age group. Rather, "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies" on the child's functioning are considered. *Id.* § 416.926a(l).

limitation in attending and completing tasks; and (3) no limitations in the remaining domains. (R. 31-37.)

In reaching her conclusions, the ALJ found that the testimony of A.M. and plaintiff was "generally credible," although A.M.'s statements concerning the "intensity, persistence and limiting effects of [her alleged] symptoms are not wholly credible." (R. 28-29.) The ALJ further found that Dr. White's opinion that A.M. "fit the features required by DSM-IV . . . to meet the overall classification of ADHD, Combination Type" (R. 278-79), was a "typographical error" and that given the rest of his assessment, Dr. White meant that A.M. did *not* fit the DSM-IV description of ADHD. Nevertheless, the ALJ "credited" A.M.'s ADHD as a severe impairment. (R. 27.) The ALJ gave "significant weight" to Dr. Voss's opinion, except that the ALJ found a less than marked limitation, rather than no limitation, in the domain of acquiring and using information. (R. 29-30.) As for Dr. Kravitz's opinion that A.M. has marked limitations in attending and completing tasks, the ALJ accorded it "very little" weight, and, in the domain of acquiring and using information, found a less than marked limitation, rather than Dr. Kravitz's finding of no limitation. (R. 30.) The ALJ gave "great weight" to the questionnaire that A.M.'s special-education teacher, Ms. Flood, completed on October 11, 2012. (R. 30.)

The ALJ concluded that A.M.'s ADHD symptoms are controlled effectively in school by her medication, without additional therapy by a mental-health professional. The ALJ noted that although A.M.'s symptoms may worsen in the afternoon, she is a growing teenager and her medication dosage had not been adjusted in several years. The ALJ also cited A.M.'s GAF score, which is discussed below. (R. 37.) Based on her findings, the ALJ concluded that A.M. had not been disabled within the meaning of the Act at any time between February 22, 2011 and December 21, 2012. (R. 38.)

**D.      Analysis**

With respect to the ALJ's finding that A.M.'s impairment did not meet or medically equal a listing, plaintiff argues that the ALJ "improperly reject[ed]" Dr. White's conclusions that A.M. meets "the overall classification of ADHD," "indicating significant deficiencies in inattention, hyperactivity and impulsivity."  (Pl.'s Mem. at 11-13 (citing R. 278-79).)  Plaintiff also contends that the ALJ's conclusion that A.M.'s impairment did not functionally equal the listings is not supported by substantial evidence.  The Court will address each argument in turn.

**1.      Meeting or Medically Equaling a Listed Impairment**

The ALJ stated that she examined and considered all of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, in particular Listing 112.11 (ADHD), and that while she found that A.M.'s ADHD was a severe impairment, it did not meet or medically equal the criteria of any listing.  (R. 25.)  The ALJ further stated that the "medical evidence does not document listing-level severity," no acceptable medical source mentioned findings equivalent in severity to the criteria of any listed impairment, and "the record does not demonstrate medically documented findings of marked inattention, marked impulsiveness, or marked hyperactivity with medication compliance."  (R. 25.)

Plaintiff submits that in light of Dr. White's opinion, substantial evidence does not support the ALJ's determination that Listing 112.11 is not met or equaled here.  Dr. White stated in his Psychological Evaluation that A.M. "does fit the features required by DSM-IV, indicating significant deficiencies in inattention, hyperactivity and impulsivity, to meet the overall classification of ADHD, Combination Type."  (R. 278-79.)  A few lines down, he also states: "Axis I - ADHD, Combination Type" and "Axis II - No Diagnosis."  (R. 279.)  Plaintiff argues that a "reasonable interpretation" of Dr. White's "significant deficiencies" statement is that

15

"A.M. could be deemed to medically meet or equal listing 112.11." (Pl.'s Mem. at 13-14.) In plaintiff's view, the ALJ impermissibly "played doctor" when concluding that Dr. White's statement was likely a typographical error, and, in light of Dr. White's opinion, substantial evidence does not support the ALJ's conclusion that the listing is not met or medically equaled. (*Id.* at 13.)

In the section of her decision where she discussed whether A.M. has an impairment that functionally equals a listing, the ALJ addressed Dr. White's evaluation and expressed her belief that it contained a typographical error, stating that "it appears that Dr. White meant that the claimant does <u>not</u> fit DSM-IV for significant deficiencies in inattention, hyperactivity, or impulsivity . . . , as otherwise this sentence and use of the term significant is inconsistent with the rest of his report." The ALJ continued: "Nevertheless, I have credited the claimant's ADHD as a severe impairment." (R. 27.)

The claimant bears the burden of showing that her impairment meets a listing, and she must show that her impairment satisfies all of the criteria specified in the listing. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The criteria for the ADHD listing are as follows:

> Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A.      Medically documented findings of all three of the following:
> 1.      Marked inattention; and
> 2.      Marked impulsiveness; and
> 3.      Marked hyperactivity;
> and
> B. . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11. The criteria set forth in paragraph B2 of § 112.02 are as follows:

For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests . . . ; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.02(B)(2).

Dr. White opined that A.M.'s ADHD met the diagnostic criteria of DSM-IV. Given Dr. White's discussion of his personal observations and testing of A.M., which did not reveal any possible problems other than "somewhat elevated" motor activity, "somewhat pressured" speech, and a problem subtracting $7.50 from $18.00, it is understandable why the ALJ thought that Dr. White's diagnosis was a typographical error. The diagnosis was rather abrupt and did not seem to follow from its immediate context. But because Dr. White's opinion was also based on A.M.'s medical records and statements by the plaintiff, and because Dr. White stated his diagnosis at two separate points in his report, the Court believes that Dr. White likely *did* mean

to diagnose A.M. as having ADHD that met the DSM-IV criteria and his statement was *not* a typographical error.[6]

Ultimately, though, any error by the ALJ in this regard was harmless because she specifically stated that she credited A.M.'s ADHD as a severe impairment. (R. 27.) Whether Dr. White's statement that A.M. fit the DSM-IV features, "indicating significant deficiencies in inattention, hyperactivity and impulsivity," is sufficient evidence that A.M.'s impairment meets or medically equals Listing 112.11 is another matter. As the Commissioner points out, a diagnosis is not the same thing as meeting or medically equaling a listing. *See* 20 C.F.R. §§ 404.1525(d), 416.925(d) ("Can your impairment(s) meet a listing based only on a diagnosis? No. Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.").

Dr. White's statement was a diagnosis. Although he stated that "significant deficiencies in inattention, hyperactivity, and impulsivity" were "indicat[ed]," he did not refer to Listing 112.11 (or any listing) or opine on whether the listing was met, medically equaled, or functionally equaled; whether the deficiencies were "marked"; or whether there were resulting marked impairments in the age-group criteria. Nothing in his opinion suggests that he was purporting to assess whether A.M.'s impairment was severe enough to meet or medically equal Listing 112.11 (or her functioning in the six domains). The only medical opinions that discussed the listings were those of Drs. Kravitz and Voss, who concluded that A.M.'s ADHD did not meet

---

[6]The Court disagrees with plaintiff, however, that the ALJ was "playing doctor." The ALJ was interpreting Dr. White's report and descriptions of his testing of A.M. simply as a reader, not by substituting her own medical determinations.

or medically equal a listing. Those opinions are uncontradicted. Accordingly, the ALJ did not err in determining that A.M.'s ADHD did not meet or medically equal Listing 112.11.

### 2. Functionally Equaling a Listed Impairment

Plaintiff asserts that the ALJ also erred in finding that A.M.'s ADHD did not functionally equal the severity of a listed impairment. Only the first two of the six domains are at issue. Plaintiff presents several arguments. The first is that the ALJ failed to consider the "whole child" and opted instead to "rubber stamp" Dr. Voss's opinion that A.M. had no limitations in five domains and a less than marked limitation in attending and completing tasks. (Pl.'s Mem. at 15.) This argument is belied by the ALJ's discussion of Dr. Voss' opinion. Although the ALJ gave Dr. Voss's opinion "significant weight," she departed from his opinion that A.M. had no limitations in acquiring and using information, and found that A.M. had less than marked limitations in that domain, based on A.M.'s school records and her need for special services for language arts (outside of the regular classroom). (R. 30.) The ALJ's discussion of the evidence regarding A.M.'s functioning is detailed and not a mere "rubber stamp" of any of the doctors' opinions.

Next, plaintiff points out that Dr. White, as opposed to the other evaluating psychologists, actually saw A.M., and plaintiff contends that the ALJ erred by failing to consider Dr. White's statement about A.M.'s "significant deficiencies," which in plaintiff's view "implicitly contradicts" the opinions of Drs. Voss and Kravitz. (Pl.'s Mem. at 15; Pl.'s Reply at 5.) The Court is unpersuaded. As explained above, nothing in Dr. White's opinion suggests that he was assessing A.M.'s functioning in the six domains, so Dr. White's general statement about A.M.'s "significant deficiencies" in diagnosing her with ADHD does not contradict the opinions of Drs. Voss and Kravitz on functioning.

Plaintiff further asserts that substantial evidence does not support the ALJ's determination that A.M. had less than marked limitations in the domains of acquiring and using information and attending and completing tasks. As for acquiring and using information, both Dr. Kravitz and Dr. Voss found that A.M. had no limitation in this domain. They relied on the fact that A.M. was in "regular" classes. (R. 291, 297.) Dr. Voss also noted that A.M. was taking Focalin and that her grades were mostly As and Bs. (R. 291.)[7] Based on the school records, the ALJ departed from both opinions and found that A.M. had less than marked limitations in this domain. The ALJ noted that A.M.'s fifth-grade IEP showed that A.M. tested below grade level in language and in math concepts and applications. The ALJ also acknowledged that A.M. received special education services in the resource room for language arts and writing and inclusion services in her regular classroom for reading and math, and that Ms. Flood indicated in her questionnaire that A.M. had serious problems in the areas of oral and written expression. The ALJ further noted that according to the IEP, A.M. had tested at grade level in math computation; the time spent by A.M. in the separate special-education classroom amounted to only twelve percent of the school day; Ms. Flood did not indicate that A.M. had "serious" problems in other aspects of this domain; as a sixth grader, A.M. improved to a fifth-grade level in reading and a 4.4 grade level in written language; and her April 2011 IEP report card also had demonstrated improvement. (R. 32.)

Regarding the "attending and completing tasks" domain, Dr. Voss found that A.M. had less than marked limitations, noting A.M.'s "elevated" motor activity during the examination

_____

[7]Plaintiff criticizes the reliance on the medical records insofar as they contained a statement that plaintiff characterizes as A.M.'s unconfirmed "self-report" of her grades to a nurse. (Pl.'s Reply at 6-7.) But the IEP reports a number of "A" grades that are consistent with this "self-report." (R. 183, 193.)

with Dr. White and her problem with a money calculation, as well as her ADHD diagnosis and treatment with Focalin and that she was not receiving any psychiatric treatment, but also noting the many tasks she performed well in Dr. White's examination, her placement in regular classes, that she was improving in school per her IEP and had no behavior problems, and that her grades were mostly As and Bs.  (R. 291.)  Dr. Kravitz found that A.M. had marked limitations, but the only factors he noted in support of that finding were the elevated motor activity and calculation problem.  (R. 297.)  The ALJ afforded "very little" weight to Dr. Kravitz's opinion and explained that his narrative does not support the finding.  She gave more weight to Dr. Voss's opinion that A.M. had less than marked limitations in this domain and discussed his narrative.

In finding that A.M. had less than marked limitations in the first two domains, the ALJ gave "great weight" to the questionnaire that Ms. Flood completed on October 11, 2012.  Ms. Flood stated that A.M. was "doing extremely well [that] year in school"; came "ready to learn and [] focused"; and was "participating" and "organized (with support)."  (R. 218.)  Ms. Flood noted that A.M.'s medication was helping her with attention and completing tasks and that she could tell when A.M. had taken it.  (R. 214, 218.)  Although Ms. Flood noted "serious" problems in two of thirteen aspects of the "attending and completing tasks" domain, the ALJ determined that the existence of these problems was not inconsistent with a finding of less than marked limitations in light of Ms. Flood's repeated statements that with medication compliance, A.M. performs much better.  Similarly, although Ms. Flood noted "serious problems" in two of ten aspects of the "acquiring and using information" domain, the ALJ found less than marked limitations considering that A.M.'s problems in other aspects of the domain were less severe, she had no problem understanding and participating in class discussions, and she had shown improvement per her IEP report card and the questionnaire.

Plaintiff devotes a significant portion of her brief to arguing why the opinions of Drs. Voss and Kravitz were flawed. But the ALJ gave "very little" weight to the opinion of Dr. Kravitz, and her explanation for why she did so was well supported. As to Dr. Voss, who opined that A.M. had *no* limitations in the domain of acquiring and using information, the ALJ found that A.M. had *greater* limitations—less than marked—in that domain, and agreed with his opinion that A.M. had less than marked limitations in attending and completing tasks. (That determination is discussed below.)

Plaintiff contends that in giving "great weight" to Ms. Flood's statements, the ALJ "failed to properly interpret" the questionnaire she completed. (Pl.'s Mem. at 18.) In plaintiff's view, the ALJ "inexplicably focused on only improvements" and improperly minimized the severity of the limitations indicated throughout A.M.'s IEP. (*Id.*) Plaintiff quotes extensively from A.M.'s fifth-grade IEP to support her argument that the ALJ erred in not finding marked limitations. But the ALJ clearly did consider the many limitations described in A.M.'s IEP and the questionnaire, as well as the limitations described by the plaintiff and A.M. herself, both of whom the ALJ found "generally credible" (although finding A.M.'s symptoms not as severe as described in the testimony). Indeed, the ALJ found that A.M. did have limitations in both relevant domains. Plaintiff argues, however, that the ALJ should have found marked limitations, and plaintiff emphasizes various portions of the record that demonstrate A.M.'s struggles in school: while A.M. spent only 12 percent of her day in the special-education classroom, she also received special-education services in the regular classroom for an additional 24 percent of the day; while Ms. Flood indicated that A.M. was reading at a fifth-grade level and writing at a grade level of 4.4, A.M. was actually of seventh-grade age; and the progress A.M. had made was toward goals that were tailored to her in consideration of her impairment.

The ALJ provided adequate reasoning for her finding that A.M.'s limitations were less than marked, including the following considerations. The 2011 IEP stated that while A.M. tested below grade level in language and math concepts and applications, she tested at grade level in math computation. Ms. Flood's questionnaire, which showed that A.M. had made improvements in sixth grade and functioned well when she took her medication, was more recent evidence than the 2011 IEP, on which plaintiff heavily relies. The ALJ specifically noted that at the time Ms. Flood completed the questionnaire, she had known A.M. for four years and was working with her two hours per day for development of reading and language arts. The questionnaire responses indicated that A.M. did not have serious problems in most aspects of the two relevant domains of functioning and that A.M. was improving with assistance and medication.[8] In addition, the ALJ noted that A.M.'s primary care physician (Circle Family Care, in 2011) had assigned A.M. a score of 70 on the CGAS (Children's Global Assessment Scale),[9] (R. 302), which is at the top of the range (the least severe score in the range) wherein the child is described as having "some

[8]Plaintiff contends that the ALJ "never acknowledge[d]" that A.M. repeated the second grade and was thus "still two years behind children her same age without limitations." (Pl.'s Mem. at 19.) While the ALJ did not articulate this piece of evidence in this manner (and was not required to do so), she explicitly stated that she was applying the correct standard: "I have first evaluated how the child functions in all settings and at all times, *as compared to other children the same age who do not have impairments*." (R. 26 (emphasis added).) The ALJ also specifically and repeatedly mentioned that A.M. had repeated the second grade. (R. 28, 33.) The Court also notes that the questionnaire Ms. Flood completed, to which the ALJ gave great weight, instructed Ms. Flood to compare the child's functioning "to that of same-aged children who do not have impairments." (R. 212.)

[9]The ALJ referred to the score as a "GAF" (Global Assessment of Functioning) score. The GAF scale is "useful for planning treatment" and measures both severity of symptoms and functional level. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). More precisely, A.M.'s score was measured on the CGAS, which is "a precursor to the GAF scale" and "used for children eighteen and under." *See Handford v. Colvin*, No. 12 C 9173, 2014 WL 114173, at *5 n.5 (N.D. Ill. Jan. 10, 2014). In any event, the scales' respective descriptions of the relevant assessment range are highly similar.

difficulty" in an area of functioning, but "generally function[s] well" and has "some meaningful interpersonal relationships." (R. 29); *see also* Children's Global Assessment Scale, *available at* http://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.

The plaintiff's motion is essentially a request to reweigh the evidence and give greater weight to the portions that plaintiff believes support the claim of disability. This Court, however, is not permitted to reweigh the evidence, engage in its own analysis, or substitute its judgment for that of the Commissioner. *See, e.g.*, *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The ALJ properly considered and carefully reviewed the record as a whole and provided a number of reasons why she found that A.M. had some, but less than marked, limitations in the first two domains (meaning that the limitations do not interfere *seriously* with her functioning). The ALJ sufficiently articulated her assessments and the reasons for her findings, which are supported by the record. Because the ALJ's conclusion was supported by substantial evidence, the Court will affirm the decision.

## CONCLUSION

For the reasons stated above, the ALJ reasonably found that A.M. does not meet, medically equal, or functionally equal any of the listings of impairments. Her decision to deny benefits is supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed, and plaintiff's request for a reversal and award of benefits, or, in the alternative, for remand to the Commissioner is denied. Plaintiff's motion for summary judgment [11] is denied, and defendant's motion for summary judgment [24] is granted. The Clerk is directed to enter judgment in favor of defendant. Civil case terminated.

**SO ORDERED.**                    **ENTERED:**    December 21, 2015

_____
**JORGE L. ALONSO**
**United States District Judge**